1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KIET ANH TRAN,

            Petitioner,                          No. CIV S-04-1840 MCE DAD P

      vs.

W. J. SULLIVAN, Warden,

            Respondent.                    FINDINGS AND RECOMMENDATIONS

_____/

            Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered against him on July 3, 1997 in the San Joaquin County Superior Court on charges of first degree murder, attempted murder, and committing the charged offenses while armed with a firearm.  Petitioner seeks relief on the grounds that: (1) the trial court violated his right to a fair trial when it admitted evidence of petitioner's gang affiliation and evidence of guns not used in the charged shooting; (2) his trial counsel rendered ineffective assistance; (3) jury instruction error violated his right to a fair trial; and (4) the evidence was insufficient to support his conviction on the charge of attempted murder.  Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

1

PROCEDURAL AND FACTUAL BACKGROUND[1]

Sixteen-year-old Andy Tran suffered a fatal gunshot wound to his chest as he ducked behind the couch in a friend's living room.  An adult houseguest in the home, Sen Dang, was also shot, but not fatally, during the same incident.  A jury convicted defendants Kiet Ahn (sic) Tran (Kiet), Si Van Dang (Si), Nhat Minh Nguyen (Nhat), and Len Nguyen (Len) of the first degree murder of Andy Tran (Andy) (Pen. Code, § 187)[2] and the attempted murder of Sen Dang (§§ 664/187).[3]

I.  The Shooting and Its Aftermath

At the time of these events, both defendant Len and the victim, Andy, were students at Plaza Robles High School, a continuation high school.  Len attended the first daily session, which ended at 10:15 each morning, and Andy attended the second session, which began at 10:25 a.m.

Andy was a close friend of Cuong Phan's.  Cuong Phan lived with his family across the street from the school, and Andy often went to his house (the Phan house) before or after school.   Although Len had also visited the Phan house, Cuong Phan observed that Len and Andy did not get along.

On March 6, 1996-the day before the shooting-shortly after the first session of the high school, Len and Andy got into a fight outside the Phan house after Andy told Len to shut the door to the house and Len failed or refused to do so.  The fight did not last long.  And when it was over, Cuong Phan's cousin took Len home.[4]

Len immediately contacted defendant Si and reported that he had experienced a problem with Andy.  All four defendants then went to the Phan house, searching for Andy and Cuong Phan, but neither were there.

/////

---

[1]  The following summary is drawn from the May 15, 2003 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 4-15, filed in this court as Exhibit B to respondents' Answer.

[2]  Unless otherwise designated, all further statutory references are to the Penal Code.

[3]  Because several defendants, the deceased, and some witnesses have identical surnames, for clarity and out of no disrespect, we shall refer to the defendants and the deceased by their first names.

[4]  Cuong Phan's cousin was Tang Tran, also called Tyrone.  Another defendant, Si, had visited Tang Tran at the Phan house several times.

2

The next morning, Si called defendants Kiet and Nhat to wake them, picked them up at their respective homes, and drove them to the Phan house, where they arrived about 10:10 a.m. Cuong Phan was inside with his family, his parents' friend Sen Dang, and his friends Phillip Nguyen and Huy Vo. Si approached the Phan house and knocked on the front door. When no one answered, Si returned to his parked car and stood smoking and talking with Kiet and Nhat.

A few minutes later, Si, Kiet, and Nhat saw Andy's mother drop him off for the second school session. Passing a short distance from where the three defendants then stood, Andy approached the Phan house, knocked, and was admitted.

Si waited for Len. As the first school session ended, Len approached the other defendants standing near Si's car. The four appeared to talk seriously for a moment. Then, Si, Nhat, and Kiet took off their jackets and put them into the car, and all of the defendants approached the Phan house. Cuong Phan testified at trial that through a window, he saw that Si and two others were approaching the house.

Suddenly, the front door opened. Testimony was in conflict as to whether defendants knocked on the door and were admitted by someone inside the house, or merely let themselves in. In any event, defendants stepped into the living room entry or stood just outside the entry as Cuong Phan, Andy, Phillip Nguyen, and Huy Vo simultaneously entered the living room from the hall.[5] Sen Dang was also in the living room, having slept the night on the couch.

A witness across the street from the Phan house testified that as defendants entered the house, they "threw up" their hands in a quick gesture, as if to indicate that they were "calling someone out ... to fight."

Cuong Phan told Si to "[g]et the fuck out of my house." Si responded, "[F]uck you," and asked Kiet for the gun. Kiet pulled a black handgun from his waistband and handed it to Si; Si started shooting in Andy's direction. Andy ducked behind the couch, but was killed by a bullet that pierced the couch and went through his

/////

---

[5] Testimony at trial about which of the four defendants were in the house was somewhat in conflict. Cuong Phan and Huy Vo testified that only three defendants - Si, Nhat, and Kiet - were in the house. But students waiting across the street for the second session to begin saw defendants approach the house, and anticipating a fight, watched to see what would happen. One such student saw all four defendants enter the house, led by Si and Len. Si also testified that Len was in the house with him.

chest.  Once struck by the bullet, Andy fell face down onto the floor.  Sen Dang was hit near the left ankle by a bullet.

Witnesses in the house testified that Si began shooting immediately or within five seconds of his exchange with Cuong Phan. Witnesses across the street likewise testified that Si started shooting "right away" after entering the house at virtually the same moment that the door opened.  Those who heard or saw the shots generally agreed that all of the shots were fired from the vicinity of the front door, although testimony on the number of shots fired varied from between three and five to eight.

Defendants ran to Si's car, but it failed to start.  They accordingly fled on foot.  Cuong Phan appeared to give chase, but quickly returned to the house.  Some witnesses testified that Cuong Phan had no gun and that his hands were empty.  However, Si claimed that Cuong Phan had a gun as he chased defendants and claimed that he heard gunshots.

Responding quickly to the 911 call from the Phan house,[6] police recovered a total of five spent nine-millimeter shell casings from the linoleum living room entry and just outside the front door. Police also searched outside the house and around the block for other shell casings and blood, but found none.  Investigating Department of Justice criminalists concluded, based on the location of the bullet holes, that all of the shots had been fired from the direction of the front door toward the couch.

However, a single spent .380 shell casing was found behind the couch near where Andy lay after he was shot.  Both officers and criminalists observed that the casing appeared to have dust on it and concluded that it was neither recently placed there nor involved in the shooting.[7]  A criminalist also noted that there was no evidence of powder marks on the back of the couch or bullet strikes near the front door so as to suggest that the .380 shell casing had been discharged recently.  A thorough search of the Phan house after the shooting revealed no evidence of weapons or live ammunition, and officers found no weapons on Andy, Cuong Phan, Phillip Nguyen, or Huy Vo.

After hiding for a while in a neighbor's yard, defendants contacted a friend, Hung Nguyen, who picked them up in his car.

Later that day, police observed Hung Nguyen's car (in which Kiet was then the sole passenger) arrive at Si's house, where Hung

---

[6]  The 911 call was received at about 10:18 a.m.

[7]  Members of the Phan family testified that they had never seen anyone clean behind the couch.

4

Nguyen retrieved a black bag, which he put into the car's passenger compartment.  Hung Nguyen later testified that Si had asked him to "save" the bag, and that Si had agreed to pick it up the next day.  The black bag contained a sawed-off shotgun without a serial number and several boxes of ammunition.  In the trunk, police also found a shotgun and a purple gym bag that contained ammunition and three more loaded guns, including a loaded nine-millimeter pistol.  In total, more than 200 rounds of ammunition were recovered from the car.

By evening on the day of the shooting, all four defendants and Hung Nguyen had been apprehended.  Police observed that Si had a small scratch on the back of his leg.

Defendants waived their Miranda[8] rights and agreed to be interviewed by police.  Nhat admitted that he was at the house during the shooting and said that his fingerprints might be on the gun-a black semiautomatic nine-millimeter pistol-because he had carried the gun as he ran from the scene, and later hid it in a neighboring yard.  Len also admitted that he had gone to the Phan house on the morning of the shooting.  On the other hand, Kiet denied being in the house when Andy was shot; he told police that he had waited in the car while the others were inside, and ran when he heard gunfire.

The nine-millimeter pistol recovered from the purple bag in the trunk of Hung Nguyen's car proved to be the murder weapon.  And a microscopic evaluation of the nine-millimeter shell casings found at the Phan house revealed that all were fired by that pistol, including the bullet that killed Andy.

The fingerprints of Si and Nhat were recovered from Si's car outside the Phan house.  Kiet's palm print was recovered from the shotgun found in the trunk of Hung Nguyen's car.

Defendants were charged with the first degree murder of Andy (§ 187 [count 1] ) and the attempted murder of Sen Dang (§§ 664/187 [count 2] ).  Arming and personal firearm use enhancements (§§ 12022, subd. (a)(1), 12022.5, subd. (a)(1)) were alleged against all defendants except Len, against whom only an arming enhancement was alleged (§ 12022, subd. (a)(1)).  As to Si only, it was also alleged that he had inflicted great bodily harm against Sen Dang (§ 12022.7).  Hung Nguyen was charged as an accessory to murder after the fact. (§ 32 [count 3] ).

Hung Nguyen and the defendants (except for Len) were also charged with receiving a stolen nine-millimeter, semiautomatic pistol (§ 496, subd. (a) [count 4] ), and Kiet, Len, and Hung

---

[8]  Miranda v. Arizona (1966), 384 U.S. 436 [16 L.Ed.2d 694].

Nguyen were charged with other weapon offenses not relevant here.

II. The Prosecution Theory

The prosecution's theory at trial was that defendants were members of a criminal street gang called the Mafia Asian Crew, that they believed Andy to be a member of a rival street gang, and that the shooting was a "home invasion murder" committed in retaliation for Andy's fight with Len the previous day.

In support of that theory, the prosecution introduced evidence that Nhat told a jail classification officer[9] after his arrest that he was a member of the Mafia Asian Crew (MAC) and that its members had problems with gangs (among others) named Vietnamese (or Viet) Asian Pride (VAP) and Lifetime Brothers. Nhat also said that Andy and most of the others at the Phan house were members of the Lifetime Brothers.

Si's girlfriend, Ahn Phan, told police that "Si and his friends[10] belonged to MAC" and that MAC members were having problems with members of the gang VAP.[11]

Si advised the classification officer that if he were housed in jail with members of the Lifetime Brothers or VAP, there would be trouble because Andy was a member of one of those gangs-although not too much trouble because most of them were juveniles. Si also said that his friends might be recognized as gang members. Although Si denied gang membership for himself, when officers told him that his girlfriend had identified the gang in which he was a member, he agreed to tell the truth if they named the gang. The officer responded, "You got it.  M.A.C.  Sorry."  And Si responded, "You got me, huh."  Checking, the officer asked, "Okay, so, is that true?"  And Si responded, "Yeah. No. Yeah."

A student watching the Phan house from across the street on the morning of the shooting testified that she thought there might be gunplay when the defendants suddenly appeared in a group at the Phan house because they had not "gotten along" with Andy and his friends for a long time.

/////

---

[9]  Classification officers are charged with evaluating with whom arrestees should be housed in jail.

[10]  Ahn Phan did not identify "Si's friends," but during his interview with police, Si repeatedly referred to Len as "my friend."

[11]  At trial, however, Si's girlfriend denied that Si was a member of MAC.

6

Sometime before trial, Hung Nguyen pleaded no contest to the charges against him.  He testified under a grant of immunity that after the shooting, Kiet had retrieved from Kiet's house the purple gym bag that was in his car trunk and which later proved to contain the murder weapon, and a long wrapped item that could have been the shotgun found in his trunk.

III.  The Defense Case

Of the defendants at trial, only Si testified.  He admitted shooting Andy, but testified that he had done so in self-defense.

Si testified that immediately after he entered the Phan house, Andy confronted him with a .380-caliber automatic handgun and shot twice; one bullet grazed Si's left leg.[12]  Only then, after Si turned to run out the door and yelled that Andy was shooting at him, did Kiet hand him a gun, with which Si then returned fire into the house because he knew Len was "trapped" there.[13]  According to Si, he and Andy exchanged several volleys of gunfire, with Andy firing six or seven shots, and Si shooting about five.[14]  Even after Si heard a scream, Andy continued to shoot at him.  After he and the other defendants ran from the Phan house, Cuong Phan chased after them, and Si heard three or four additional shots fired at him.

At trial, Si also denied that he went to the Phan house on the day of the shooting to beat up Andy in retaliation for his having fought with Len, although he knew that there would be "more trouble" if he walked into the Phan house with Len.  He adopted his police interview statement that he had gone to the Phan house that day to collect money from Cuong Phan's cousin, to protect Len, and to "escort" him home.  Of Len's dispute with Andy, Si opined that it was disrespectful for Andy to have been fighting with Len and further that it would be disrespectful to Cuong Phan's cousin were he to beat up Andy in the Phan house while the cousin was at home.

Finally, Si denied ever having been a member of MAC and said that Nhat alone among the defendants had been a member.  Si admitted, however, that he had lied to police during his interview about who shot Andy.

/////

---

[12]  Si also testified that Andy, not Cuong Phan, said, "[G]et the fuck out of the house."

[13]  Si denied knowing in advance that Kiet had a gun and denied ever having held a gun before.

[14]  With the exception of the bullet that grazed his leg, Si testified that all of Andy's shots went through the open front door.

In support of the theory that Si shot Andy in self-defense, Nhat introduced the testimony of Ben Schiefelbein, a Ph.D. in chemistry, who testified that he found four particles on Andy's right hand containing elements that are unique to gunshot residue and four particles on his left hand that are consistent with, but not unique to, gunshot residue.  Under cross-examination by the prosecutor, however, Schiefelbein acknowledged that Andy had not fired a gun because, had he done so, more particles would have been found on his hands.  The presence of so few particles on Andy's hand could be explained, in Schiefelbein's opinion, by the fact that several gunshots in a relatively small room could produce a "cloud of gunshot residue," which would "settle on everything," including Andy's hands.

Another forensic scientist, Michelle Fox, did not examine evidence from the scene, but testified on Nhat's behalf that the number of particles found is not generally significant to an analysis of the presence of gunshot residue and that gunshot residue can deposit on someone's hand only if the gun is fired within a few feet of the person.

Anticipating Si's assertion that he had been shot by Andy, the prosecutor introduced the following evidence: None of the boys running from the scene were observed limping; the pants that Si had been wearing had no bullet hole; Si's girlfriend had told police that Si did not report that he had been shot, which he would have done had it happened; and the wound on Si's leg was a mere scratch, similar to one found on Kiet's wrist after his arrest.

Finally, the defense introduced evidence from one neighbor who testified that on the day of the shooting she saw three or four boys running, and one other boy, who appeared to be chasing the others and holding a gun.  Thereafter, she heard one or two gunshots, although she saw no one shoot.

IV. The Convictions

The jury convicted defendants of the first degree murder of Andy, for which each defendant subsequently received a sentence of 25 years to life, and of the attempted murder of Sen Dang, for which each defendant received a concurrent sentence of seven years.  The jury also found that in committing these offenses, Si and Kiet were personally armed with a firearm (§ 12022, subd. (a)(1)) and that Si both personally used a firearm (§ 12022.5, subd. (a)(1)) and intended to inflict great bodily injury upon Sen Dang (§ 12022.7, subd. (a)).

/////

/////

/////

ANALYSIS

I.  Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a

9

1   federal habeas court independently reviews the record to determine whether habeas corpus relief

2   is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

3   Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

4   reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

5   AEDPA's deferential standard does not apply and a federal habeas court must review the claim

6   de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

7   1167 (9th Cir. 2002).

8   II.  Petitioner's Claims

9        A.  Evidentiary Error

10              Petitioner claims that the trial court violated his right to a fair trial when it

11   admitted evidence of petitioner's gang affiliation and evidence of guns not used in the shooting

12   of Andy Tran.  The California Court of Appeal rejected these arguments, reasoning as follows:

13              A.  Admission of Gang Membership Was Not Error

14              Defendants' gang affiliation was the subject of in limine motions
             by the prosecution.  The trial court ultimately excluded, as more

15           prejudicial than probative, the proposed testimony of a law
             enforcement gang expert.  However, it admitted (1) evidence of

16           defendants' statements about their own gang affiliations and that of
             their friends,[15] and (2) evidence that defendants believed that Andy

17           and others at the Phan house were members of another unfriendly
             gang.

18
             On appeal, defendants renew their arguments that it was error to

19           admit evidence of their gang membership.  They contend that such
             evidence impermissibly suggested a propensity to commit crimes,

20           lacked probative value, was unduly prejudicial and inflammatory,
             and should not have been admitted after the court rejected "the

21           same evidence when offered in support of the expert testimony."
             They also contend that their statements to the jail classification

22

23   _____

24        [15]  Nhat admitted membership in MAC and stated that murder victim Andy had been a
     member of either Vietnamese Asian Pride, Midnight Players, or Lifetime Brothers, and that he

25   had problems with those gangs.  Si's girlfriend reported to police that Si and his friends were
     members of MAC.  Si himself told officers that his friends were gang members and that Andy

26   was a member of an unfriendly gang, and at one point said, "You got me," in response to officers'
     suggestion that he was a member of MAC.

officer about gang membership were inherently unreliable or obtained involuntarily.

"Evidence of gang membership is considered prejudicial because it tends to establish criminal disposition." (People v. Pinholster (1992) 1 Cal.4th 865, 945, 4 Cal.Rptr.2d 765, 824 P.2d 571.) But notwithstanding this potentially prejudicial effect, "gang evidence is admissible if relevant to motive or identity, so long as its probative value is not outweighed by its prejudicial effect." (People v. Williams (1997) 16 Cal.4th 153, 193, 66 Cal.Rptr.2d 123, 940 P.2d 710 (hereafter Williams III ); People v. Champion (1995) 9 Cal.4th 879, 922, 39 Cal.Rptr.2d 547, 891 P.2d 93; People v. Maestas (1993) 20 Cal.App.4th 1482, 1497, 25 Cal.Rptr.2d 644; People v. Contreras (1983) 144 Cal.App.3d 749, 755-758, 192 Cal.Rptr. 810 (Contreras I ); People v. Yu, supra, 143 Cal.App.3d at pp. 375-377, 191 Cal.Rptr. 859; see also People v. Frausto (1982) 135 Cal.App.3d 129, 140, 185 Cal.Rptr. 314 [summarizing cases holding that evidence of gang membership is relevant to the issue of motive].)  Evidence of gang affiliation may also be admissible to show premeditation and deliberation. (People v. Rand (1995) 37 Cal.App.4th 999, 1000-1001, 44 Cal.Rptr.2d 686.)

Moreover, "[t]he admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason. [Citation.]" (People v. Olguin (1994) 31 Cal.App.4th 1355, 1369, 37 Cal.Rptr.2d 596.)

Here, we cannot say that the trial court abused its discretion in admitting evidence related to gang membership.  Evidence of defendants' gang affiliation and their beliefs about Andy's affiliation with a rival gang was highly relevant to the prosecution's theory of why Andy was killed.  (See Williams III, supra, 16 Cal.4th at p. 194, 66 Cal.Rptr.2d 123, 940 P.2d 710.)  It offered a motive for all four defendants to respond with force following a relatively minor scuffle between Andy and Len.  And the gang affiliation, and the motive it supplied, tended to suggest that the attack on Andy was premeditated and not spontaneous or the result of the heat of passion.  Finally, since the jury was instructed that a person who aids and abets another in the commission of a crime is also guilty of any other crime committed by the principal which is the natural and probable consequence of the crime pursuant to the "natural and probable consequences" doctrine (People v. Prettyman (1996) 14 Cal.4th 248, 262, 58 Cal.Rptr.2d 827, 926 P.2d 1013 ( Prettyman )), evidence of gang affiliations, along with evidence of the gang's arsenal of weapons (see section B, post ), was also relevant to whether murder or attempted murder could be a natural and probable consequence of an assault where committed by a gang.

11

Admittedly, "California courts have long recognized the potentially prejudicial effect of gang membership evidence."  (People v. Maestas, supra, 20 Cal.App.4th at p. 1497, 25 Cal.Rptr.2d 644.)  But all evidence, including gang membership, "which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is 'prejudicial.'  The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues.  In applying section 352, 'prejudicial' is not synonymous with 'damaging.'"  (People v. Yu, supra, 143 Cal.App.3d at p. 377, 191 Cal.Rptr. 859.)  It nonetheless "'is proper to introduce evidence which is even unpleasant or negative pertaining to an organization in issue which is relevant on the issue of motive or the subject matter at trial.'"  (People v. Plasencia (1985) 168 Cal.App.3d 546, 552, 223 Cal.Rptr. 786.)  Accordingly, when gang membership "an integral and unavoidable fact relevant to ... motive," its admission is not an abuse of discretion.  (Ibid.)

In this case, because the gang evidence was highly probative on the issues of intent, motive, and the natural and probable consequences doctrine, we will not overturn the trial court's exercise of its discretion.

Defendants suggest that "[t]he trial court erred in allowing the prosecution to introduce evidence of gang affiliation, after excluding expert testimony, based upon the same theory of relevance, as unduly prejudicial."  But an evidentiary ruling on an expert witness, whether right or wrong, cannot preclude a separate and correct ruling on the testimony of a lay witness.  Moreover, there was no inconsistency in the court's rulings.  As the court later clarified, it prohibited testimony from the gang expert because "the gang expert was going to rely on otherwise inadmissible evidence in making his and stating his opinions."[16]

Nor is Nhat's citation to People v. Bojorquez (2002) 104 Cal.App.4th 335, 128 Cal.Rptr.2d 411, helpful to his position since that case admitted evidence regarding gang membership but merely held that the further admission of testimony about gangs' criminal tendencies was an abuse of discretion under the circumstances of that case.

We also reject defendants' contention that the trial court was required to reject as unreliable their admissions to the jail classification officer concerning gang affiliations.  The point is not well developed nor given a separate heading as required by

---

[16]   At the time the trial court excluded the expert testimony, it noted that "the danger that flows is that a lot of otherwise inadmissible evidence is placed before the jury with a proper admonition shortly following which does ... create a risk and a substantial risk."

California Rules of Court, rule 14(a)(1)(B) (and former rule 15) and thus can be ignored.  (Opdyk v. California Horse Racing Bd. (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4, 41 Cal.Rptr.2d 263.)

In any event, "[t]o determine whether a statement was voluntary or coerced, we examine the totality of the circumstances.  [Citation.] Coercive police activity is a necessary predicate but does not itself compel a finding that a resulting confession is involuntary." (People v. Bradford (1997) 14 Cal.4th 1005, 1041, 60 Cal.Rptr.2d 225, 929 P.2d 544 ( Bradford I).)  Not only is the record bereft of any evidence of police coercion, but defendants' statements that they did not fear potential trouble from rival gang members in jail belies their suggestion on appeal that they felt "compelled ... to request not being housed with members [of] any gang in which [Andy] was even remotely suspected of involvement."

B. Evidence of Firearms Other than the Murder Weapon Does Not Require Reversal

The trial court denied defendants' in limine request to exclude evidence of the various firearms found in Hung Nguyen's car, in which Kiet was a passenger, after the shooting.  Defendants complain that "[t]he trial court's admission over defense objection of the weapons and ammunition in Hung Nguyen's car that were not used in the commission of the crime was error."  They claim that it was of no relevance to the determination of their guilt or innocence and only demonstrated defendants' propensity for violence.  The claim is waived as a matter of procedure and wrong on the merits.

At the time of the defendants' unsuccessful motion in limine, defendants Si, Kiet, and Nhat were facing charges under count 4 for receiving stolen property relating to the gun used in the murder. Although defendants subsequently objected that the stolen nature of the other weapons was irrelevant, the court ruled that as long as there was a stolen weapon count, the evidence was relevant, presumably to show defendants' knowledge that the murder weapon was stolen. Defendants Si, Nhat, and Kiet then pleaded no contest to count 4.  As a result, the trial court ruled that the jury would not be told about "the alleged stolen character" of the weapons. However, the trial court did not rule that the presence of the weapons found in Hung Nguyen's car (and provided by Kiet and Si) was irrelevant, and the defendants did not renew their objections to any reference to the guns during trial.

"'Generally when an in limine ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal.' [Citations.]"  (People v. Morris (1991) 53 Cal.3d 152, 189, 279 Cal.Rptr. 720, 807 P.2d 949, disapproved on other

grounds in People v. Stansbury (1995) 9 Cal.4th 824, 830, fn. 1, 38 Cal.Rptr.2d 394, 889 P.2d 588.)  This is because "[e]vents in the trial may change the context in which the evidence is offered to an extent that a renewed objection is necessary to satisfy the language and purpose of Evidence Code section 353....  '[U]ntil the evidence is actually offered, and the court is aware of its relevance in context, its probative value, and its potential for prejudice, matters related to the state of the evidence at the time an objection is made, the court cannot intelligently rule on admissibility.' [Citation.]  In these kinds of circumstances, an objection at the time the evidence is offered serves to focus the issue and to protect the record." (People v. Morris, supra, 53 Cal.3d at p. 190, 279 Cal.Rptr. 720, 807 P.2d 949.)  "In summary, ... a motion in limine to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfies the basic requirements of Evidence Code section 353, i.e.: (1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context." (Ibid.)

In light of the changed circumstances of the charges faced by the defendants at trial and the changing factual context of the case, defendants should have renewed the objection in order to preserve it.  Indeed, Si argues in his reply brief that "[o]nce all defendants pleaded guilty to ... count [4], there was no relevance to the evidence."  But this merely highlights that changed circumstances required defendants to renew their objection after they pleaded guilty in order to preserve it.

However, even if defendants had not waived their objection, the court did not abuse its discretion in admitting evidence of the weapons provided by Si and Kiet to Hung Nguyen following the shooting.

The general rule governing the admission of evidence of weapons not used in the commission of a charged crime, as the Attorney General acknowledges, is stated in People v. Riser (1956) 47 Cal.2d 566, 577, 305 P.2d 1 (overruled on other grounds in People v. Chapman (1959) 52 Cal.2d 95, 98, 338 P.2d 428, and People v. Morse (1964) 60 Cal.2d 631, 648-649, 36 Cal.Rptr. 201, 388 P.2d 33):  "When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed.  There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon.  [Citations.] When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed

the crime, but only that he is the sort of person who carries deadly weapons. [Citations.]"

But People v. Riser, supra, 47 Cal.2d 566, 305 P.2d 1, did not state that evidence of other weapons may never be admitted even if it is relevant to separate issues in the case. "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered." (Ginns v. Savage (1964) 61 Cal.2d 520, 524, fn. 2, 39 Cal.Rptr. 377, 393 P.2d 689.) Indeed, although the Supreme Court ruled in Riser that admission of evidence of weapons, other than the murder weapon, discovered in defendant's possession several weeks following the commission of the murder, was error, the court subsequently distinguished that decision from a circumstance where an unrelated weapon and ammunition were "located in defendant's truck ... by deputy sheriffs at the crime scene, shortly after commission of the crimes, and there was no direct evidence as to the fatal shooting that would render this evidence irrelevant to establish facts material to proof of the charged offenses." (People v. Neely (1993) 6 Cal.4th 877, 896, 26 Cal.Rptr.2d 189, 864 P.2d 460, italics added.) In short, a defendant's possession of unrelated weapons can be relevant depending upon the context of their discovery and the issues in the case.

In this case, the evidence that Kiet and Si had a virtual arsenal of other weapons, combined with Si's gang affiliation, made it likely that the natural and probable consequence of Si's attack on Andy would result in the use of lethal force pursuant to the natural and probable consequences doctrine. It also allowed an inference that their friends, Nhat and Len, would know that they had weapons available for any confrontation.

In any event, even if any objection to the evidence of other weapons had not been waived and even if the evidence should have been excluded, it is not reasonably probable that a result more favorable to defendants would have been reached in the absence of the foregoing evidence. (See People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243; People v. Nelson (1964) 224 Cal.App.2d 238, 255-256, 36 Cal.Rptr. 385.) As discussed in greater detail in part III of the Discussion, post, substantial evidence demonstrates that defendants acted in concert to carry out a preconceived plan to shoot Andy in the Phan house. The evidence also shows that defendants conferred before the shooting, that Kiet brought the murder weapon to the house, that Si used it within seconds of entering the house and killed the target of his actions, that Nhat carried the gun away from the Phan house, and that Kiet later secreted it in a bag in Hung Nguyen's car. While evidence of defendants' gang affiliations certainly contributed to the verdict, the

/////

15

1   absence of evidence of their other weapons would not have
    changed it.
2
    Si argues that any error was not harmless because "there was
3   substantial evidence of self-defense," including gunshot residue on
    Andy's hands and witnesses who said that defendants were chased
4   by a man with a gun.  This contention fails because, among other
    things, the evidence of self-defense was not substantial: The
5   purported fact that defendants were chased by a man with a gun did
    not support a claim of self-defense because Si shot Andy before
6   that chase.   Instead, defendants' defense was based on Andy's
    assault on Si.  But defendant's own expert, Ben Schiefelbein,
7   admitted that Andy had not fired a gun because more particles
    would have been found on his hand if that had been the case.
8   Because there is no reasonable likelihood that the verdict would
    have been different absent evidence of the other guns, we conclude
9   that any error was harmless.

10  (Opinion at 32-42.)

11              1.  Evidence of Gang Affiliation

12          Petitioner claims that he was denied a fair trial based upon the admission of

13  evidence that he and his co-defendants were affiliated with gangs.  (Pet. at (5).)  "The admission

14  of 'other acts' evidence will violate due process only when there are no permissible inferences

15  the jury may draw from the evidence."  Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998)

16  (emphasis in original) (internal quotations and citations omitted).  See also Jammal v. Van de

17  Kamp, 926 F.2d 918, 920 (9th Cir. 1991) (same).  Because the gang evidence in this case was

18  admitted to establish intent, motive, and with respect to whether murder was a natural and

19  probable consequences of the assault on Andy, all of which were material issues in this case, the

20  state court did not err in finding the evidence admissible.  See United States v. Abel, 469 U.S.

21  45, 49 (1984) (deciding that gang membership was "sufficiently probative of ... possible bias ...

22  to warrant its admission into evidence.");  United States v. Santiago, 46 F.3d 885, 889 (9th Cir.

23  1995) (recognizing that gang evidence is admissible as proof of motive);  Nguyen v. Runnels, No.

24  C03-0689CRB, 2003 WL 22939239, *6 (N.D. Cal. Dec. 5, 2003) (evidence of gang-affiliation

25  admitted at petitioner's murder trial did not violate due process because the jury could draw a

26  permissible inference from the evidence with respect to motive and intent); see also Aguilar v.

16

1    Alexander, 125 F.3d 815, 820 (9th Cir. 1997) (in a murder prosecution, evidence of petitioner's

2    involvement in drug dealing was properly admitted as relevant to his motive in connection with

3    the killing).  Because the jury at petitioner's trial could draw permissible inferences from the

4    gang membership evidence, admission of that evidence did not violate petitioner's right to due

5    process.  See Jammal, 926 F.2d at 920.  Accordingly, petitioner is not entitled to relief on this

6    claim.

7                  2.  Firearms Evidence

8                  Petitioner also claims that the trial court's admission into evidence of the firearms

9    found in Hung Nguyen's car violated his right to a fair trial.  (Traverse at 1.)  The California

10   Court of Appeal concluded that petitioner had waived this issue because of the failure of his trial

11   counsel to make a contemporaneous objection when the evidence was admitted.  Respondent

12   argues that the state court's ruling in this regard constitutes a procedural bar precluding this court

13   from addressing the merits of this claim.

14                 State courts may decline to review a claim based on a procedural default.

15   Wainwright v. Sykes, 433 U.S. 72, 81-82 (1977).  As a general rule, a federal habeas court "'will

16   not review a question of federal law decided by a state court if the decision of that court rests on

17   a state law ground that is independent of the federal question and adequate to support the

18   judgment.'"  Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996)

19   (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).  The state rule for these purposes is

20   only "adequate" if it is "firmly established and regularly followed."  Id.  (quoting Ford v.

21   Georgia, 498 U.S. 411, 424 (1991)).  See also Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir.

22   2003) ("[t]o be deemed adequate, the state law ground for decision must be well-established and

23   consistently applied.")  The state rule must also be "independent" in that it is not "interwoven

24   with the federal law."  Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan

25   v. Long, 463 U.S. 1032, 1040-41 (1983)).  Even if the state rule is independent and adequate, the

26   claims may be reviewed by the federal court if the petitioner can show:  (1) cause for the default

17

1    and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to

2    consider the claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at

3    749-50.

4            Respondent has met his burden of adequately pleading an independent and

5    adequate state procedural ground as an affirmative defense.  See Bennett, 322 F.3d at 586.

6    Petitioner does not deny that his trial counsel did not raise a contemporaneous objection to the

7    admission of evidence of weapons not used in the commission of the murder.  In addition,

8    petitioner has failed to meet his burden of asserting specific factual allegations demonstrating the

9    inadequacy of California's contemporaneous-objection rule as unclear, inconsistently applied or

10   not well-established, either as a general rule or as applied to him.  Bennett, 322 F.3d at 586;

11   Melendez v. Pliler, 288 F.3d 1120, 1124-26 (9th Cir. 2002).  Petitioner's claim is therefore

12   procedurally barred.  See Coleman, 501 U.S. at 747; Harris v. Reed, 489 U.S. 255, 264 n.10

13   (1989); Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004).  Petitioner has failed to

14   demonstrate that there was cause for his procedural default or that a miscarriage of justice would

15   result absent review of the claim by this court.  See Coleman, 501 U.S. at 748; Vansickel v.

16   White, 166 F.3d 953, 957-58 (9th Cir. 1999).  The court is therefore precluded from considering

17   the merits of this claim.

18           Even were this claim not procedurally barred, it lacks merit and should be rejected.

19   A habeas petitioner is not entitled to relief based on constitutional trial error unless he shows

20   actual prejudice, or that the error "'had substantial and injurious effect or influence in determining

21   the jury's verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v.

22   United States, 328 U.S. 750, 776 (1946)).  For the reasons set forth by the California Court of

23   Appeal in affirming petitioner's conviction, it cannot be said that there is any reasonable

24   probability that evidence of petitioner's possession of other firearms not used in the murder

25   influenced the outcome of this case.  Accordingly, petitioner is not entitled to relief on this claim.

26   /////

18

B. Ineffective Assistance

Petitioner next claims that his trial attorney rendered ineffective assistance by failing to object to the admission of evidence that he and his co-defendants were affiliated with gangs. Specifically, he faults counsel for failing to "bring forth more compelling evidence to refute the use of weaker and irrelevant evidence, because it doesn't matter whether a person is a Gang member or Factory worker." (Pet. at consecutive p. 7.)

Respondent argues that petitioner's claim in this regard has not been exhausted in state court. Notwithstanding the exhaustion requirement, this court will recommend that petitioner's claim be rejected on the merits pursuant to 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Id. at 687-88. After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003). Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. Strickland, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered

1   by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an

2   ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

3   followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at

4   697).

5         Petitioner has failed to demonstrate deficient performance with respect to this

6   claim.  As explained above, petitioner's counsel, along with the other defense counsel, argued

7   strenuously to exclude all evidence of gang membership and succeeded in excluding from

8   evidence expert opinion testimony on the subject of gangs.  Petitioner has failed to explain what

9   his counsel should have done differently.  Nor has petitioner shown that his trial counsel's

10  performance with regard to the admission of gang evidence fell outside the "wide range of

11  professionally competent assistance."  Strickland, 466 U.S. at 690.  Accordingly, petitioner is not

12  entitled to relief on this claim.

13        C.  Jury Instruction Error

14        Petitioner claims that the trial court violated his right to due process by giving a

15  jury instruction on murder by lying in wait.  The California Court of Appeal rejected this

16  argument, reasoning as follows:

17              Over the objection of defense counsel, the trial court instructed the
             jury on the alternative theories of first degree murder of (1) murder
18           by premeditation and deliberation and (2) murder by lying in wait.

19              In connection with lying in wait, the trial court instructed the jury,
             in part, as follows: "Murder which is immediately preceded by lying
20           in wait is murder of the first degree.  [¶]  The term 'lying in wait,' ...
             is defined as a waiting and watching for an opportune time to act[,]
21           together with a concealment by ambush or some other secret design
             to take the other person by surprise even though the victim is aware
22           of the murderer's presence.  [¶]  The lying in wait need not continue
             for any particular time provided its duration is such to show a state
23           of mind equivalent to premeditation or deliberation.  [¶] ... [¶]  In
             the crime of murder by lying in wait[,] a necessary element is the
24           existence in the mind of a defendant of a concealed purpose or plan
             to surprise the victim."

25

26  /////

20

Defendants contend that the instruction "was error because it was not supported by sufficient evidence and was given special emphasis by the court's late reading to the jury...." We disagree.

Defendants first assert, as they argued at trial, that the prosecution did not provide the defense with advance warning that this theory would be proffered because it was requested on the day before the court read the instructions to the jury and only given after the court reconvened the following week. Citing Sheppard v. Rees (9th Cir. 1990) 909 F.2d 1234 (Sheppard), defendants contend on appeal that they were afforded constitutionally inadequate notice of the prosecution's lying-in-wait theory, and that Sheppard requires reversal.

In Sheppard, supra, 909 F.2d 1234, the Ninth Circuit granted habeas corpus relief on the ground that the defendant had received constitutionally inadequate notice of the prosecution's felony-murder theory, stressing that "[a]t no time during pretrial proceedings, opening statements, or the taking of testimony was the concept of felony-murder raised, directly or indirectly." (Id. at p. 1235.) Felony-murder instructions were requested for the first time on the morning after the jury instructions conference. (Ibid.) The Ninth Circuit reversed the conviction, concluding that it could not "regard as fair a trial in which the defendant's right to defend was impaired by a lack of notice as to the nature and cause of the accusation." (Id. at p. 1238.)

Sheppard, supra, 909 F.2d 1234, is not dispositive here. First, California courts have observed that Sheppard is not binding on us (People v. Crawford (1990) 224 Cal.App.3d 1, 8, 273 Cal.Rptr. 472) and "cannot be squared with binding California Supreme Court authority." (People v. Scott (1991) 229 Cal.App.3d 707, 716-717, 280 Cal.Rptr. 274, citing People v. Murtishaw (1981) 29 Cal.3d 733, 751, fn. 11, 175 Cal.Rptr. 738, 631 P.2d 446, disapproved on other grounds in People v. Boyd (1985) 38 Cal.3d 762, 772-773, 215 Cal.Rptr. 1, 700 P.2d 782; People v. Thomas (1987) 43 Cal.3d 818, 829, fn. 5, 239 Cal.Rptr. 307, 740 P.2d 419; People v. Witt (1915) 170 Cal. 104, 148 P. 928.)

In addition, Sheppard has been limited to its facts. (909 F.2d 1234.) There, the prosecutor waited until after the instructions had been settled to raise the possibility of proceeding on the felony-murder theory, and the felony underlying the felony-murder theory "did not figure prominently in the trial." (People v. Crawford, supra, 224 Cal.App.3d at p. 8, 273 Cal.Rptr. 472.) But here, the facts underlying the prosecution's theory of lying in wait were squarely presented, and the instruction was requested during the instructions conference. Moreover, unlike the felony-murder rule, which is an alternative to the usual elements of murder, "[l]ying in wait is the functional equivalent of proof of premeditation, deliberation, and

21

intent to kill."  (<u>People v. Stanley</u> (1995) 10 Cal.4th 764, 794-795, 42 Cal.Rptr.2d 543, 897 P.2d 481.)

Accordingly, where, as here, the instruction is the functional equivalent of that which defendant has been given notice, where the prosecutor requests instructions on his theory of lying in wait along with his other instructions, and where, as here, the factual basis of the theory has been central to the prosecution's theory, no ambush of the sort found objectionable in <u>Sheppard</u> has occurred.  (<u>See People v. Gurule</u> (2002) 28 Cal.4th 557, 629-630, 123 Cal.Rptr.2d 345, 51 P.3d 224; <u>People v. Gallego</u> (1990) 52 Cal.3d 115, 189, 276 Cal.Rptr. 679, 802 P.2d 169, <u>cert. den.</u> (1991) 502 U.S. 924 [112 S.Ct. 337, 116 L.Ed.2d 277]; <u>Morrison v. Estelle</u> (9th Cir.1992) 981 F.2d 425, 428.)

On the merits, defendants argue that the court erred in instructing the jury on lying in wait because there was no evidence that they concealed themselves so as to surprise Andy and "they did not hide the vehicle and assume a hidden position waiting for Andy Tran" after arriving at the Phan house.

That defendants did not secrete themselves is not fatal to a finding that the instruction was justified.  Lying in wait requires that the murder be "committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage...."  (<u>People v. Morales</u> (1989) 48 Cal.3d 527, 557, 257 Cal.Rptr. 64, 770 P.2d 244; <u>see also</u> <u>People v. Stanley</u>, <u>supra</u>, 10 Cal.4th at p. 795, 42 Cal.Rptr.2d 543, 897 P.2d 481.)

Accordingly, the element of concealment is satisfied by a showing """"that a defendant's true intent and purpose were concealed by his actions or conduct.  It is not required that he be literally concealed from view before he attacks the victim.""""  (<u>People v. Sims</u> (1993) 5 Cal.4th 405, 432-433, 20 Cal.Rptr.2d 537, 853 P.2d 992 [emphasis added], <u>disapproved on another point</u> in <u>People v. Storm</u> (2002) 28 Cal.4th 1007, 1031-1032, 124 Cal.Rptr.2d 110, 52 P.3d 52; <u>see</u>, <u>e.g.</u>, <u>People v. Tuthill</u> (1947) 31 Cal.2d 92, 100-101, 187 P.2d 16 [although victim was aware of defendant's physical presence prior to attack, necessary elements of "waiting, watching, and secrecy all were present"]; <u>People v. Byrd</u> (1954) 42 Cal.2d 200, 208-209, 266 P.2d 505 [defendant waited in front of his former wife's home, then entered it, conversed with her, and shot her], <u>disapproved on other grounds</u> in <u>People v. Morse</u>, <u>supra</u>, 60 Cal.2d at pp. 648-649, 36 Cal.Rptr. 201, 388 P.2d 33.)

Mindful of our duty "to determine whether there is evidence to support the instruction, not scour the record in search of evidence suggesting a contrary view"  (<u>People v. Ceja</u>, <u>supra</u>, 4 Cal.4th at p. 1143, 17 Cal.Rptr.2d 375, 847 P.2d 55), we conclude that the

evidence supported the lying-in-wait instruction.  The defendants disguised their purpose not only by hiding the murder weapon in Kiet's pants, but by allowing Andy to pass unmolested into the Phan house, from which Andy might conclude that defendants did not intend to lethally hurt him and be off guard.   Indeed, not knowing defendants had a gun, Andy might have felt safe in the presence of others in the Phan house.  Defendants then waited for Len to join them.  With the advantage of all members, defendants went into the Phan house and shot Andy within seconds.  From this evidence, the jury could reasonably conclude that defendants concealed their murderous intention and struck from a position of surprise and advantage, factors that are the hallmark of a murder by lying in wait.

We also reject defendants' contention that the timing of the giving of this particular instruction prejudicially "subjected [it] to special scrutiny by the jury."  Defendants have provided us with no authority for the proposition that the mere timing of giving this jury instruction could constitute prejudicial error, and their reliance on People v. Valenzuela (1977) 76 Cal.App.3d 218, 142 Cal.Rptr. 655, is misplaced.  Indeed, Valenzuela states that the timing of instructing a jury is a matter within the sound discretion of the trial judge.  (Id. at p. 221, 142 Cal.Rptr. 655.)  Further, here, the jury received the standard instruction to disregard the order in which the instructions were given (CALJIC No. 1.01), which we may presume was heeded.  (People v. Adcox, supra, 47 Cal.3d at p. 253, 253 Cal.Rptr. 55, 763 P.2d 906.)

(Opinion at 70-75.)

A challenge to jury instructions does not generally state a federal constitutional

claim.  See Middleton v. Cupp, 768 F.2d at 1085 (citing Engle v. Isaac, 456 U.S. at 119);

Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  Habeas corpus is unavailable for

alleged error in the interpretation or application of state law.  Middleton, 768 F.2d at 1085; see

also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378,

1381 (9th Cir. 1986).  However, a "claim of error based upon a right not specifically guaranteed

by the Constitution may nonetheless form a ground for federal habeas corpus relief where its

impact so infects the entire trial that the resulting conviction violates the defendant's right to due

process."  Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d

1107 (9th Cir. 1980)).  See also Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (To

prevail on such a claim petitioner must demonstrate that an erroneous instruction "so infected the

1   entire trial that the resulting conviction violates due process.")  The analysis for determining

2   whether a trial is "so infected with unfairness" as to rise to the level of a due process violation is

3   similar to the analysis used in determining, under Brecht, 507 U.S. at 623, whether an error had "a

4   substantial and injurious effect" on the outcome.  See McKinney v. Rees, 993 F.2d 1378, 1385

5   (9th Cir. 1993).

6          In order to warrant federal habeas relief, a challenged jury instruction "cannot be

7   merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

8   process right guaranteed by the fourteenth amendment." Prantil, 843 F.2d at 317 (quoting Cupp v.

9   Naughten, 414 U.S. 141, 146 (1973)).  In making its determination, this court must evaluate the

10  challenged jury instructions "'in the context of the overall charge to the jury as a component of the

11  entire trial process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239

12  (9th Cir. 1984)).  The United States Supreme Court has cautioned that "not every ambiguity,

13  inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."

14  Middleton v. McNeil, 541 U.S. 433, 437 (2004).  Further, in reviewing an allegedly ambiguous

15  instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has

16  applied the challenged instruction in a way' that violates the Constitution." Estelle, 502 U.S. at

17  72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).  See also United States v. Smith, 520

18  F.3d 1097, 1102 (9th Cir. 2008).

19         The state appellate court's conclusion that the giving of a jury instruction on lying

20  in wait did not violate petitioner's right to a fair trial is not contrary to or an unreasonable

21  application of the federal due process principles set forth above and should not be set aside.  As

22  explained by the state appellate court, there was substantial evidence to support each of the

23  elements of murder by lying in wait as that crime is defined in California law.  Under the

24  circumstances presented here, where petitioner and his co-defendants waited until the opportune

25  time to surprise and kill Andy in his friend's house, a jury instruction on murder by lying in wait

26  did not render petitioner's trial fundamentally unfair.  Further, as explained by the state appellate

24

court, this case is readily distinguishable from the situation presented in <u>Sheppard v. Rees</u>, 909

F.2d 1234, 1236 (9th Cir. 1990).  In that case, the government conceded that its conduct

affirmatively misled the defendant by switching to a different theory of criminal liability at the last

minute, thereby ambushing him and denying him an effective opportunity to prepare a defense.

For the reasons set forth in the state court's opinion, that was not the case here.  Accordingly,

petitioner is not entitled to relief on this claim.

      D.  <u>Sufficiency of the Evidence</u>

           Finally, petitioner claims that the evidence introduced at his trial was insufficient

to support his conviction on the charge of attempting to murder Sen Dang.  The California Court

of Appeal rejected this argument, reasoning as follows:

> Defendants contend that the evidence was insufficient to support
> their convictions for the attempted murder of Sen Dang.  Kiet
> argues that "there was no direct evidence suggesting that the shooter
> had an intent to kill Sen Dang" and that "the circumstantial
> evidence proves only that Sen Dang was accidentally hit by a stray
> bullet fired during the gun battle."
>
> The Attorney General responds that "[g]iven the fact that Si fired at
> least five shots into the house, it is also inferable that [his] plan was
> not necessarily confined to killing Andy."  Further, he argues that
> "even assuming that the other [defendants] intended only to kill or
> shoot Andy, they are still liable for attempted murder as aiders and
> abettors under the 'natural and probable consequences' doctrine."
>
> "An attempt to commit a crime consists of two elements: a specific
> intent to commit the crime, and a direct but ineffectual act done
> toward its commission."  (§21a; <u>People v. Toledo</u> (2001) 26 Cal.4th
> 221, 229, 109 Cal.Rptr.2d 315, 26 P.3d 1051; <u>see</u> 1 Witkin &
> Epstein, <u>Cal.Criminal Law</u> (3d ed. 2000) Elements, § 53, p. 262.)
> Accordingly, "'"[s]pecific intent to kill is a necessary element of
> attempted murder.  It must be proved, and it cannot be inferred
> merely from the commission of another dangerous crime."
> [Citation.]'  [Citations.]"  (<u>People v. Swain</u> (1996) 12 Cal.4th 593,
> 605, 49 Cal.Rptr.2d 390, 909 P.2d 994; <u>accord</u>, <u>People v. Bland</u>
> (2002) 28 Cal.4th 313, 327-328, 121 Cal.Rptr.2d 546, 48 P.3d 1107
> (<u>Bland</u>).)
>
> Thus, to find Si guilty of attempted murder, the jury had to find that
> Si intended to kill Sen Dang.  With respect to the other defendants,
> their "culpability for attempted murder as an aider and abettor
> necessarily depends on the commission of that crime by the

perpetrator." (People v. Patterson (1989) 209 Cal.App.3d 610, 614, 257 Cal.Rptr. 407; see People v. Mendoza, supra, 18 Cal.4th at p. 1123, 77 Cal.Rptr.2d 428, 959 P.2d 735.)  As noted earlier, they must "'act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.'" (Mendoza, at p. 1123, 77 Cal.Rptr.2d 428, 959 P.2d 735.)  But "[o]nce the necessary mental state is established, the aider and abettor is guilty not only of the intended, or target, offense, but also of any other crime the direct perpetrator actually commits that is a natural and probable consequence of the target offense." (Ibid.)

For purposes of our analysis of the sufficiency of the evidence for attempted murder, we will first focus on whether there was evidence upon which a rational trier of fact could conclude that Si intended to kill Sen Dang.  The jury was correctly instructed with CALJIC No. 8.66 that express malice is a prerequisite to a verdict of attempted murder.

Nonetheless, the California Supreme Court has recently ruled in Bland, supra, 28 Cal.4th at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107, that although the doctrine of transferred intent does not apply to attempted murder, "the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what it termed the 'kill zone.'"  There, the defendant – a member of a gang – shot at three persons in a vehicle, killing his target (a rival gang member who was driving) and injuring, but not killing, the two passengers (who were not gang members).  The California Supreme Court upheld the attempted murder convictions of the two passengers, which the Court of Appeal had reversed.  It found that "a person who shoots at a group of people [can] be punished for the actions towards everyone in the group even if that person primarily targeted only one of them" (28 Cal.4th at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107), that the intent to kill a particular target does not preclude finding a concurrent intent to kill others within the "kill zone" (ibid.), and that "[t]his concurrent intent theory is not a legal doctrine requiring special jury instructions such as is the doctrine of transferred intent" but rather "is simply a reasonable inference the jury may draw in a given case." (28 Cal.4th at p. 331, fn. 6, 121 Cal.Rptr.2d 546, 48 P.3d 1107.)  It added that "a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (Ibid.)  It then found in that case that "the evidence ... virtually compelled a finding that, even if defendant primarily wanted to kill [the gang member], he also, concurrently, intended to kill the others in the car.  At the least, he intended to create a kill zone." (Id. at p. 333, 121 Cal.Rptr.2d 546, 48 P.3d 1107.)

On the basis of Bland, supra, 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107, we conclude that there was sufficient evidence for the jury to conclude that Si possessed the requisite specific intent to kill

26

others within the kill zone necessary to shoot Andy.  After all, he fired at least five shots into a crowded room.  Analogizing the car with two passengers in Bland with the crowded room of five people here, the jury was entitled to find that Si had a concurrent intent to murder – and shot with knowledge that he would kill – anyone who was near his target when he sprayed the room with five gunshots.

We next turn to the sufficiency of the evidence supporting the convictions of the other defendants as aiders and abettors.  "Accomplice liability is 'derivative,' that is, it results from an act by the perpetrator to which the accomplice contributed."  (Prettyman, supra, 14 Cal.4th at p. 259, 58 Cal.Rptr.2d 827, 926 P.2d 1013.)  "When the offense charged is a specific intent crime, the accomplice must 'share the specific intent of the perpetrator'; this occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.'  [Citation.]"  (Ibid.)

Admittedly, there was no direct evidence that the other defendants knew that Si would spray the room with bullets in order to kill Andy, thereby creating a "kill zone."

But there was sufficient evidence under the natural and probable consequences doctrine.  The natural and probable consequences doctrine is "based on the recognition that 'aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put in motion.'  [Citation.]"  (Prettyman, supra, 14 Cal.4th at p. 260, 58 Cal.Rptr.2d 827, 926 P.2d 1013.)  The test of natural and probable consequences is an objective one and "'"depends upon whether, under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant."  [Citation.]'  [Citations.]"  (People v. Culuko (2000) 78 Cal.App.4th 307, 327, 92 Cal.Rptr.2d 789.)

A reasonable person would have foreseen that the reasonably foreseeable consequence of shooting into a crowded room to murder one person would be to murder any innocent bystander within the "kill zone."  (Bland, supra, 28 Cal.4th at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) And clearly, the jury could reasonably infer that defendants were aware that there were a number of people at the Phan house, including Andy, who could be hit in the line of fire.  Further, in light of the evidence that the attack on Andy was an aspect of gang warfare, "[t]he frequency with which ... gang attacks result in homicide" supported the foreseeability that an attempt to murder one person in an occupied home would result in the murder (or if they survived, the attempted murder) of others.  (See People v. Montano (1979) 96 Cal.App.3d 221, 227, 158 Cal.Rptr. 47 [Defendant's conviction for attempted murder depended upon the

27

determination that a codefendant's assault with intent to commit murder was a natural and probable consequence of an attack on rival gang member].)  In short, if Si was properly convicted of the attempted murder of those within the kill zone pursuant to <u>Bland</u>, <u>supra</u>, 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107, so, too, were his aiders and abettors since such a kill zone was the natural and probable consequence of the premeditated murder of Andy in a crowded room.  This is but a direct application of the natural and probable consequences doctrine, which declares:  "'[An aider and abettor] is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets.'"  (<u>Prettyman</u>, <u>supra</u>, 14 Cal.4th at p. 261, 58 Cal.Rptr.2d 827, 926 P.2d 1013.)

Accordingly, there was sufficient evidence to support defendants' convictions for attempted murder.

(Opinion at 56-61.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  <u>In re Winship</u>, 397 U.S. at 364.  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  <u>See also</u> <u>Prantil</u>, 843 F.2d at 316.  "[T]he dispositive question under <u>Jackson</u> is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"  <u>Chein v. Shumsky</u>, 373 F.3d 978, 982 (9th Cir. 2004) (quoting <u>Jackson</u>, 443 U.S. at 318).  "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the writ, the federal habeas court must find that the decision of the state court reflected an objectively unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of the case.  <u>Id.</u> at 1275 & n.13.

The court must review the entire record when the sufficiency of the evidence is challenged in habeas proceedings.  <u>Adamson v. Ricketts</u>, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

1   vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is

2   the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

3   reasonable inferences from basic facts to ultimate facts."  Jackson, 443 U.S. at 319.  If the trier of

4   fact could draw conflicting inferences from the evidence, the court in its review will assign the

5   inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  The

6   relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether

7   the jury could reasonably arrive at its verdict.  United States v. Mares, 940 F.2d 455, 458 (9th Cir.

8   1991).  Thus, "[t]he question is not whether we are personally convinced beyond a reasonable

9   doubt" but rather "whether rational jurors could reach the conclusion that these jurors reached."

10   Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court determines

11   sufficiency of the evidence in reference to the substantive elements of the criminal offense as

12   defined by state law.  Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

13          Viewing the evidence in the light most favorable to the verdict, and for the reasons

14   described by the California Court of Appeal, the undersigned concludes that there was sufficient

15   evidence from which a rational trier of fact could have found beyond a reasonable doubt that

16   petitioner was guilty of the attempted murder of Sen Dang.  As explained by the state appellate

17   court, there was evidence introduced at petitioner's trial indicating that Si intended to kill whoever

18   was in the house, or at least whoever stood in the way of Andy.  There was also substantial

19   evidence that the murder of persons other than Andy was a reasonably foreseeable consequence of

20   the attempt by petitioner and his co-defendants to murder Andy.  The state court opinion rejecting

21   petitioner's argument in this regard is a reasonable construction of the evidence in this case and is

22   not contrary to or an objectively unreasonable application of federal law.  See Woodford v.

23   Visciotti, 537 U.S. 19, 25 (2002); see also 28 U.S.C. § 2254(d)(1).  Accordingly, petitioner is not

24   entitled to habeas relief on his claim that the evidence introduced at his trial was insufficient to

25   support his conviction on the charge of attempted murder.

26   /////

CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: September 8, 2008.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8
tran1840.hc

30